Thank you, Your Honor. This is a difficult case. Do you want to identify yourself for the record? Oh, excuse me. My name is Tom Higgins. I'm appearing for the appellant. I represented him a little bit in this case pursuant to the CJA appointment. You're speaking of representing him at trial? No. I represented him only for a couple of days at the material witness deposition. Oh, I see. And then the trial attorney, a different attorney, took over, which actually goes to part of my argument here. The difficulty with the use of the depositions, the video depositions, this Court has allowed it since 1998 with Santos-Piñon in those cases saying that's fine to do. But that was pre-Crawford. And in the very early morning hours of November 6th, I found an August 16th, 2007 case in this Court and could not get it here as a supplemental authority on my Rule 28 letter, which is United States v. Yeida. I believe it's pronounced Y-I-D-A. Briefly, in that and co-defendant and testified at trial. Then the government allowed him and helped him go back to Israel with a promise he would return if needed and the case mistried. At the time it mistried, they tried to get him back and he said no for health reasons he wasn't coming back. The government moved to use the transcript from the trial testimony in the new trial after it was reset. And it was denied. And it's a very exhaustive type of 803 type of unavailability analysis. What I'm asking the Court to do is find that in this case the video deposition was insufficient. It is done every day in that district. And with the belief, I'm sure, of the government that it's fine to do that. However, there are some practical matters that Your Honor should be aware of. Those video depositions are set within two weeks. It is not uncommon to have evidence, not all the evidence at that time. Now, the record reflects a photo lineup and a great deal of discussion about the suggestibility of it and things like that. And some of the activities of the agents involved. The question is, I may be wrong, but for the life of me, I don't ever remember seeing that. So I know that's kind of out of the record. Seeing what? The photo lineup. And that's not uncommon. Because two weeks from the beginning of the case, it's not, as I said, uncommon to not have all of the government's disclosure, including something like that, which would have been important to have at that time. Because the material witnesses, that was the standard procedure. They kept them in custody. They brought them in. And they testified on the very similar basis. The material witnesses are the aliens? Yes. The two men from Poland. Yes. Okay. In this case. And they videotaped their deposition. Right. He was represented by counsel at the deposition? He was. And this is done frequently because the government doesn't want to have to hold on to the aliens and keep them in this country and put them up to keep them available for trial for a lengthy period of time so that the deposition is taken early on and then the aliens are sent back to where they belong. That's it in a nutshell, Judge. You have it. And the precise objection to this is what? The projection is this. It's all under the control of the government. In the earlier case when we talked about Maria Canul, she'd been in this country four years waiting for trial. It's the government deciding, I do not want to keep these people here, house them, feed them, whatever I have to do. But I had thought in this particular situation, the defendant, or at least defense counsel, was asked, is there an objection to videotaping a deposition for use because we're going to send the alien back? And the response was, no, we have no objection. That's correct. So isn't the issue waived? This is different also because these aliens didn't want to stay here. They wanted to get back to Poland. And I admit that. That was absolutely true. Well, this may not be the best case to raise this challenge. Correct. But I phrased it in terms of a Crawford issue because there's certainly confrontation problems that go on like this. I had thought that your client, again, had waived his presence at the deposition as well. The reason that the client was waived there is because there was a serious identification problem with this case. And he didn't want to have that bolstered by them sitting in there and saying, that's him. But that was a tactical decision. That's right. How can you claim there was a confrontation, deprivation, if he elects not to show up for a tactical reason, which is understandable on his part. But that's it. He didn't show up. And the next thing I would go to, and I really don't want to go to any length right now about the ineffective assistance of counsel because of the identity issue. What I'd like to concentrate on is, once again, we have a problem with the bringing in. The evidence is, as set forth in both the answering brief and the opening brief, that the Polish gentleman dealt with a man called Cipriano. They went from Aramco to Sonora and crossed and got into a, quote, black Jeep, close quote. Came up the highway from what, Lukeville, which is on the border. The problem that Angelica Lopez deals with is also the same problem here about the bringing in part of it. And the challenge to it is, is there has to be something besides somebody taking him to a border, somebody crossing him, somebody transporting him. That's really what it is. And the only state of the art is that Angelica Lopez breaks up the bringing in requirement essentially to somebody that crossed them and somebody in the U.S. that transported them. The person transporting him, like in Angelica Lopez, there was no link that they brought him in. Now, this case is a conspiracy plus four substantive counts. Two transportation counts and two harboring and concealing counts. One each for each of the Polish gentlemen. The question is on whether the conspiracy count can stand after Angelica Lopez came out and whether that proof of that agreement But Counsel, didn't you tell us just a minute ago that the two Poles said they dealt with Cipriano and Sonora? A man named Cipriano and Sonora. That's correct. And they were then brought across the country, brought across the border where Garcia meets them. Well, actually the record is really weird about that. And excuse me for using that non-legal term, but they bring across and they have a description of him. And they identify him as the driver. But there's no, they never say that's the guy that picks us up when we cross the border and come up there. He's the driver of the car. He's the driver of the car that they were found near when the agent went back. But it's, I don't know why that wasn't flushed out. And we know they started out at the other side. Right. But in order to be convicted of conspiracy in a case like this, if there's evidence that they have come across the border and that they've got different people at different stations sort of facilitating this, including your client who the border patrol sees shooing them off into the desert and telling them to disperse themselves as quickly as possible, whether he's driven them or not may be irrelevant to the charges against him, right? Right. And that certainly looks like there was, although no direct proof of, well, there was the proof of the people at each step of the way doing this, except for that little strange thing about getting into the black Jeep. But, and that is another example of proving an extrinsic proof of a conspiracy, that the evidence was adduced that this was a goal and people were filling that in. Is this your strongest argument, do you think? No. I will actually, looking at this now that I have some time, I'll go into a couple of the things. There is, I brought up on direct appeal the issue of ineffective assistance of counsel, revolving around the identity question. The identification took two tracks. The one Polish gentleman that was arrested said that Mr. Garcia Jaramillo was the one and that the police stated to them that it would help with their case if they identified him. Later on, as Mr. Berg points out in his answering brief, it came about that they said they would help him after he identified them. There was a period of time from the roadway checkpoint, which was south of Y, Arizona, to the Border Patrol substation, they call it the Ajo substation, it's about two, three miles away, where they were all in the same room together for a period of time. The photo lineup that was shown to them, the agent that put that lineup together admitted that one of the photos was disproportionately small compared to the other ones, that was my client's. But the point I'm getting to is there's a reason, there's a legitimate factual and legal reason to contest the identification and see if that identification tainted the in-court identification. And that was not done. It was not brought up at all. And I thought because of the record that pretty much was the only defense that was available at this time, that that should have been brought up and there was no reason why not. I'd like to reserve the rest if I could, Your Honor. Okay. May it please the Court, my name is Bruce Ferg, Assistant United States Attorney on behalf of the government in this case. Just kind of springing off of some of the points that have been raised in the prior questioning, first of all, this is not a bringing in case. If you look at the charges, there were harboring and concealing and transportation and conspiracy to do that. So the Angelica Lopez case simply does not apply here. The harboring and concealing could be done entirely within the borders of the United States without showing how the alien actually got into the United States. Absolutely. And in the statute, they're broken down as three different ways of committing the offense. Secondly, as far as the validity of the identification, what both of the Polish gentlemen indicated in their depositions was that they had been brought by this organization all the way through Mexico and up to the border and then walked by night across the border and taken to this kind of parking lot area where this pot-bellied, gray-haired, 50-60-year-old gentleman was working on this black Jeep-type vehicle. And the people who brought them across the border assisted in covertly getting them into this vehicle, and the person that was driving it, who is somewhat humorously translated as the chauffeur, sat in the front seat and had them sit in the front seat as well. And so they drove from the border, this 15, 18, however many miles it was, sitting immediately next to this gentleman. And it was this person who panicked when he thought he saw a law enforcement vehicle, pulled over to the side of the road, said, yeah, go, run away. And it was that same gentleman that they saw from their place in hiding be accosted by the Border Patrol agent, taken to the checkpoint, and whom they later identified as, in fact, being the defendant. So it's a very tight series of events and a clear identification of the defendant, which was then verified separately by the compilation of the photo ID, which was shown to them just several days later. And I made a point of including the pictures in the supplemental excerpts to point out that, yes, this gentleman down here in the middle of the bottom row is the defendant. His face appears a little bit smaller. Well, so there's this first guy up here whose face fills the entire photo. There are lots of small differences and discrepancies in the precise arrangement, but you'll notice that there is no identifiable clothing, no glasses or lack thereof compared to other people. They're all swathed so that you can't see what their clothing is like. And so a very good effort was made to make this, in fact, a reasonable lineup. And this Court's precedents say that those kinds of small differences simply do not create suggestibility. If anything, I would suggest to the Court that Mr. Number 1, whose face fills the entire photograph, if anyone was being suggested, it was him rather than the defendant. So the quality of the photo ID really is not a major issue here. With regard to the deposition testimony. Counsel, if you're correct about the appropriateness of the face lineup, the photo lineup, then is there anything else to the IAC claim? Really there is not. But, again, as I argued in the brief, I don't think that there's enough of a record for this Court to do much with. And that's why, as per your usual policy, you really should not even address it. There may well be tactical reasons even for choosing, for example, to attack an identification strictly by cross-examination rather than a motion. There is case law from this Court as well as the Arizona Supreme Court or, excuse me, Arizona appellate courts which say, based on the circumstances, that's something that a counsel may reasonably choose to do. Okay. Just who was the trial counsel? Do you remember? Steve Rawls, yes. Not Mr. ---- Yeah. Okay. And Mr. Higgins represented the defendant only in connection with some pretrial? Briefly at the time that the depositions were taken and then Mr. Rawls was substituted, carried it through the trial and conviction, and now Mr. Higgins is back to the appeal. Steve Rawls? Steve. Steve Rawls. Steve Rawls, yes, ma'am. Okay. With regard to the deposition testimony and the validity of admitting that, I would suggest that the major thing here and what differentiates it from really any of the cases, including Ida, which Mr. Higgins was kind enough to show me before we got up to argue, is that there was this waiver. They very plainly said, we want this deposition, but we don't want Mr. Garcia Jaramillo to be here. He actually consulted in the course of the deposition at the very beginning with counsel, and they came up with a written waiver that he signed off saying, I don't want to be here. And so that's about as clear a waiver of your confrontation clause as you can get, particularly when they then immediately turn around and actually sign a joint motion, and this was signed by the defendant himself as well as counsel, saying, yes, it's fine to send these witnesses back to Poland, where, of course, they're beyond subpoena power. And so there was no need, apparently, to keep them. There was no objection to them going. The defense was more than willing to let them go. And it may have been, if you do read those depositions, there are points where the interpretation or the answers are somewhat hard to make out. They may well have thought, well, here's a tactical advantage for us. We've got this kind of obscure testimony, and that's what the government is going to be stuck with. So there are a variety of reasons why this could have been done. In any event, Yida is clearly distinguishable. That was a case where there was no prior consultation with the actual defendant and his counsel. That particular witness was simply allowed to leave without prior consultation. And most importantly, the other panel of this court that decided that made a big point out of the fact that if there had been a videotape, that would have been a reasonable substitute. But because the government didn't attempt to do that, it was found not to have acted reasonably. So there are a variety of ways to distinguish that. I believe that's all that I have to say, unless you have further questions. Any further questions? No. Thank you. Thank you. Your Honors, Mr. Berg did not bring up anything that I wanted to counteract right now, and I'd not use my balance of my time. Thank you very much for your attention. Thank you. Appreciate it. The matter just argued is submitted for decision.
judges: Schroeder, Bybee, Wu